## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| A.B., ET AL., | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | Civil No. 22-3295-BAH |
| MONIFA B. MCKNIGHT, ET AL., | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Minor child A.B., through his parents and next friends L.K. and J.B. ("the parents"),
(collectively "Plaintiffs") brought suit against the Montgomery County Board of Education
("MCBE") and Superintendent Monifa B. McKnight (collectively "Defendants"), alleging
violations of the Individuals with Disabilities Education Improvement Act ("IDEA").  ECF 1
(complaint).  Pending before the Court are Plaintiffs' motion for summary judgment, ECF 26, and
Defendants' cross-motion for summary judgment, ECF 27.  The Court will construe each motion
as a motion for judgment on the record.[1]  All filings include memoranda of law and exhibits.[2]  The
Court has reviewed all relevant filings and finds that no hearing is necessary.  *See* Loc. R. 105.6

---

[1] "Where no additional evidence is introduced" in an IDEA appeal, "a motion for summary
judgment operates as a motion for judgment based on the evidence comprising the record." *Brown
v. D.C.*, 568 F. Supp. 2d 44, 50 (D.D.C. 2008) (citing 20 U.S.C. § 1415(i)(2)(C) and *Heather S. v.
Wisconsin*, 125 F.3d 1045, 1052 (7th Cir.1997)).  Here, neither Plaintiffs nor Defendants have
moved to include additional evidence.  Accordingly, Parties' cross-motions for summary judgment
will be treated as motions for judgment on the record.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-
generated page numbers at the top of the page.  When an exhibit that is not filed on ECF is
referenced, the Court will describe it and cite to the bate-stamped page number and, if available,
line numbers.

(D. Md. 2023). Accordingly, for the reasons stated below, Plaintiffs' motion for summary judgment is **DENIED** and Defendants' cross-motion for summary judgment is **GRANTED**.

## I.    BACKGROUND

### A.    The IDEA

The IDEA recognizes that disability is a "natural part of the human experience" and that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1). As such, it aims to "ensure that all children with disabilities have available to them a free appropriate public education." *Id.* at § 1400(d)(1)(A). A "free appropriate public education," usually referred to by its acronym, "FAPE," comprises "special education and related services" and is "provided at public expense" and "without charge" to the student or their family. 20 U.S.C. § 1401(9). The IDEA provides federal funding for states, such as Maryland, "that develop policies and procedures to ensure that each child has access to a FAPE." *M.M. ex rel. J.M. v. Foose*, 165 F. Supp. 3d 365, 368–69 (D. Md. 2015) (citing to 20 U.S.C. § 1412(a); Md. Code, Educ. §§ 8–401 *et seq.*; Md. Code Regs. 13A.05.01.01 *et seq.*).

To ensure delivery of a FAPE, schools utilize an individualized education plan ("IEP"), the preparation and implementation of which "require[s] careful consideration of the child's individual circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). The IDEA requires that an IEP "state the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be 'mainstreamed,'

2

*i.e.*, spend time in regular school classroom with non-disabled students." *M.C. v. Starr*, Civ. No. DKC 13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing 20 U.S.C. § 1414(d)(1)(A)). "[A]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 387 (emphasis in original). An IEP is "reasonable" where it "aim[s] to enable the child to make progress" which is appropriate in light of that child's circumstances. *Id.*

The IDEA also "requires that a child's parents be included in the IEP decisionmaking process as members of the IEP team." *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Schs*, 919 F.3d 237, 241 (4th Cir. 2019) (citing 20 U.S.C. § 1414(d)(1)(B)). If parents are dissatisfied with their child's IEP and are unable to resolve the problem with the school, parents may request "a 'due process hearing' before a state or local educational agency." *Endrew F.*, 580 U.S. at 391–92 (citing 20 U.S.C. §§ 1415(f)(1)(A), (g)). In Maryland, an administrative law judge ("ALJ") at the Maryland Office of Administrative Hearings conducts the due process hearing. Md. Code, Educ. § 8-413(d)(5)(i). "Within 120 calendar days of the issuance of the hearing decision, any party to the hearing may file an appeal from a final decision of the Office of Administrative Hearings to the federal District Court for Maryland or to the circuit court for the county in which the child resides." *Id.* at § 8-413(j); *see also* 20 U.S.C. § 1415 (e)(2)(A) (noting "[a]ny party aggrieved by" an ALJ's decision "the right to bring a civil action . . . in any State court of competent jurisdiction or in a district court of the United States."

### B.    A.B.'s Background

A.B. is a now-eighteen-year-old student who is considered "twice exceptional," meaning he is academically gifted and has a learning disability. Decision, at 5 ¶¶ 1–2.[3] Prior to residing in

---

[3] As detailed *infra*, the factual findings of the ALJ are entitled to deference. The Court will therefore reference the facts of this case as established in the administrative decision, where they

Maryland, A.B. lived in California with his biological parents, who subjected him to severe abuse and neglect. *Id.* ¶¶ 4–5. In 2016, at the age of ten, A.B. moved to Maryland to live with L.K. and J.B., who adopted him and his younger sister a year later. *Id.* at 6 ¶ 6.

During the 2016-2017 school year, A.B. was enrolled in Montgomery County Public Schools ("MCPS") at Flower Valley Elementary School. Decision, at 6 ¶ 7. At this time, he was not receiving special services under the IDEA. *Id.* Throughout the 2017-2018 year, while in sixth grade at Earle B. Wood Middle School, A.B. began to show signs of struggling both socially and academically. *Id.* ¶ 8. In 2018, MCPS then determined that A.B. was eligible to receive accommodations pursuant to a prior diagnosis of attention deficit hyperactivity disorder ("ADHD"), in accordance with Section 504 of the Rehabilitation Act. *Id.* Around the same time, A.B.'s parents also brought A.B. for a private psychoeducational evaluation. *Id.* at 7, ¶ 13. At this evaluation, A.B. underwent testing through the fifth edition of the Weschsler Intelligence Scale for Children ("WISC-V") and received a full-scale IQ score of 118, putting him in the eighty-eighth percentile. *Id.* The results of the WISC-V also evinced a wide discrepancy between A.B.'s low processing speed and his abilities in other key areas, such as fluid reasoning and working memory. *Id.* ¶ 14. A.B.'s composite scores in the latter two areas were 121 and 125, respectively, indicating "superior" functioning, while his processing speed abilities were scored only at 86, a "below average" level. *Id.* ¶ 12. As part of the larger evaluation, A.B. also underwent testing in specific areas, including in subtests called "Word Attack," "Calculation," and "Passage Comprehension," scoring marks of 116 (eighty-fifth percentile), 94 (thirty-fourth percentile), and 90 (twenty-fifth percentile), respectively. *Id.* at 8, ¶ 16.

---

are discussed in greater detail. *See A.B. v. Montgomery Cnty. Pub. Schs*, OAH No. MSDE-MONT-OT-22-08380 (Md. Off. Admin. Hr'gs Aug. 25, 2022) ("Decision").

4

Around the time A.B. underwent the psychoeducational evaluation, MCPS identified him as having a specific learning disability encompassed by the IDEA, making him eligible to receive special education services. Decision, at 8 ¶ 17. A.B. received an IEP with special education supports for the 2018-2019 school year. *Id.* ¶¶ 17–18. During the summer of 2019 and in advance of the 2019-2020 school year, A.B.'s IEP team reconvened and recommended that he be placed in the gifted and talented learning disabled ("GTLD") program at E. Brooke Lee Middle School. *Id.* ¶ 19. However, in the fall of 2019, A.B.'s parents informed MCPS that he would be attending The Lab School ("Lab"), a private school for students with learning disabilities located in Washington, D.C. *Id.* at 9 ¶ 20.

In the spring of 2020, A.B.'s parents asked MCPS to develop an IEP for A.B. for his ninth-grade year, the 2020-2021 school year. Decision, at 9 ¶ 21. On May 20, 2020, MCPS approved an IEP which recommended A.B.'s placement in the GTLD program at Northwood High School. *Id.* Nevertheless, A.B. remained at Lab for ninth grade. *Id.* ¶ 22. During the fall of 2020, A.B.'s parents challenged the IEPs that MCPS had developed for A.B.'s eighth and ninth-grade years (the 2019-2020 and 2021 school years, respectively). *Id.* ¶ 24. The ALJ in that case found that both IEPs were reasonably calculated to meet A.B.'s needs and provide him with a FAPE. *Id.* A.B.'s parents appealed that decision to the United States District Court for the District of Maryland, which found for the school. *Id.* ¶ 25; *see also A.B. v. Smith*, No. 21-cv-00781-LKG, 2022 WL 1689427 (D. Md. May 26, 2022). On appeal, the Fourth Circuit affirmed the district court's decision. *See A.B. ex rel. L.K. v. Smith*, Civ. No. 22-1686, 2023 WL 3533595 (4th Cir. May 18, 2023).

## C. Current Case History

In March of 2021, while A.B. was still enrolled at Lab, his parents requested that MCPS develop an IEP for 2021-2022, A.B.'s tenth grade year. Decision, at 10 ¶ 26. MCPS determined

that A.B. was due for his triennial evaluation and so consolidated that meeting with the IEP meeting. *Id.* ¶ 27. Ahead of the meeting, Jean Marie Joseph ("Joseph"), a special education resource teacher at Northwood and the chair of A.B.'s IEP team, provided A.B.'s parents with the old IEP MCPS approved for A.B. in 2020, a copy of an IEP from Lab, and the new draft IEP. *Id.* ¶¶ 27–28.

This initial meeting was held remotely on April 27, 2021 and included the school-based team members, A.B.'s parents, staff from Lab, and Laura Ressler ("Ressler"), an outside educational consultant hired by A.B.'s parents. Decision, at 10 ¶ 29. During the meeting, MCPS requested, and the parents agreed, that A.B. undergo both an educational and a psychological assessment in order to better determine his needs. *Id.* at 11 ¶ 32. A.B. underwent the educational assessment, conducted by Joseph, in June of 2021. *Id.* ¶ 36. Results from that assessment indicated that A.B.'s academic abilities had declined, at least as measured through the same subject-specific subtests he had taken in 2018. For example, where he had obtained a score of 116 in the "Word Attack" subtest in 2018, he now scored a 90, representing a 26-point decrease. *Id.* at 12, ¶ 38. His scores in "Calculation" and "Passage Comprehension" also dropped, by 17 and 8 points, respectively, as did his scores in several other subtest areas. *Id.*

On August 2, 2021, A.B.'s parents notified MCPS through counsel that A.B. would remain at Lab for tenth grade (the 2021-2022 school year) and requested that MCPS fund A.B.'s placement there. Decision, at 13 ¶ 39. Two weeks later, on August 19, MCPS responded, through counsel, and notified the parents that since an IEP had not yet been proposed for A.B.'s tenth grade year, the parents' request was premature. *Id.* ¶ 40. Around the same time, the Northwood school psychologist, Dr. Trellis Jones, reached out to A.B.'s parents to schedule a psychological evaluation. *Id.* ¶ 41. The evaluation took place at Northwood on August 30. *Id.* ¶ 43.

A.B.'s IEP team reconvened for a meeting on August 31, 2021. Decision, at 14 ¶ 44. A.B.'s parents, Ressler, and the school-based team members met virtually to develop A.B.'s IEP, a draft of which was prepared in advance of the meeting. *Id.* During the meeting, A.B.'s parents were asked to share their input on his progress and they responded that, despite the results of his recent educational testing, they felt A.B. was doing well at Lab. *Id.* ¶ 48. Upon review of the draft IEP, the school-based members proposed that A.B. receive services including a daily GTLD resource class, a daily specialized reading intervention class, general education English and Science classes with support from a GTLD teacher, and general education Math and Social Studies classes with support from a paraeducator. *Id.* at 14–15 ¶ 49. After some discussion with the parents regarding class sizes and coursework rigor, the IEP was approved and recommended A.B.'s placement in the GTLD program at Northwood, with services to begin the following day. *Id.* at 15 ¶ 52. A.B.'s parents disagreed with the Northwood proposal. *Id.* ¶ 54. The IEP team agreed to reconvene for review and revision of the IEP once A.B.'s full educational and psychological evaluation results were available. *Id.* at 16 ¶ 55.

On October 5, 2021, Dr. Jones completed his report on the results of A.B.'s psychological evaluation, which Dr. Jones based on the evaluation itself, information from A.B.'s parents and teachers at Lab, and the results of A.B.'s 2018 psychoeducational evaluation. Decision, at 16 ¶ 59. In the report, Dr. Jones did not detail A.B.'s childhood history of trauma and abuse, though he knew of that history from A.B.'s previous evaluation report as well as from A.B.'s parents. *Id.* at 17, ¶ 60. Dr. Jones did note that repeat administration of the WISC-V indicated clinically significant declines in four out of the five measured indices, encompassing verbal comprehension, visual-spatial abilities, working memory, and processing speed. *Id.* at 19 ¶ 70. Elsewhere in the report, Dr. Jones noted that psychological and behavioral testing had not offered any results

7

significant to diagnose A.B. with any emotional or functional disabilities. *Id.* at 21 ¶¶ 75–76. Dr. Jones did, however, indicate some "problematic areas" for A.B., including language skills, separation fears, social difficulties, academic issues, and problems with math. *Id.* at 20 ¶ 73.

Based on the results of A.B.'s evaluation, Dr. Jones made a number of recommendations to the IEP team, including provision of extra time for completing assignments, repetition of directions, preferential seating, and periodic breaks. Decision, at 21 ¶ 77. He also followed up with A.B.'s parents to inquire about the potential cause of the decline in A.B.'s testing results and inquired specifically into whether A.B. had "experienced a traumatic brain injury or concussion or had a neurological condition that the school-based team members were unaware of." *Id.* at 22 ¶ 78. The parents indicated that A.B. had not sustained an injury and told Dr. Jones that A.B. had no neurological conditions. *Id.*

Upon Dr. Jones' completion of the report, the IEP team reconvened for a follow-up meeting, held virtually on October 27, 2021. Decision, at 22 ¶ 79. The objective of the meeting was to consider the results of Joseph's educational evaluation and Dr. Jones' psychological evaluation in order to revise and update the IEP drafted in August. *Id.* ¶ 80. During the meeting, the MCPS team members again solicited the parents' input regarding A.B.'s educational progress. *Id.* at 23 ¶ 88. They responded that they felt that his performance had improved at Lab and that he was excelling both socially and academically. *Id.* Later in the meeting, they reiterated that they felt that A.B. required the small class sizes and emotional supports offered by Lab. *Id.* at 24 ¶ 90. A.B.'s mother asked the MCPS team members if they had read the report that provided further details of A.B.'s history of trauma. *Id.* ¶ 91. Dr. Jones and Joseph indicated that they had not read it, while Sarah Jackson, an education specialist with MCPS, responded that she had, and ensured the rest of the school-based team would review it as well. *Id.* A.B.'s parents then expressed their

frustration that MCPS had not accounted for A.B.'s full trauma history in formulating the IEP and requested further consideration of A.B.'s social and emotional needs. *Id.* ¶ 92. The school-based team responded that they would further familiarize themselves with the details of A.B.'s history and revisit his IEP with that information in mind. *Id.* ¶ 93. They also requested additional information about the emotional supports available to A.B. at Lab, including an adoption affinity group which had not previously been detailed in A.B.'s IEP from Lab. *Id.* at 24–25 ¶ 94. At this time, the team agreed to convene another meeting to complete their review of A.B.'s draft IEP. *Id.* at 25 ¶ 96.

After two postponements in November and December, the IEP team met virtually again for a fourth and final meeting on January 13, 2022. Decision, at 25 ¶ 99. The meeting was attended by A.B.'s parents, Ressler, the MCPS team members, including Dr. Jones and Joseph, and two Lab staff members, Rayna Dinsmore and Chris Lanier. *Id.* MCPS staff shared updates to A.B.'s IEP that reflected his need for emotional support, which he had been receiving through his participation in Lab's adoption affinity group, and detailed that he would receive thirty minutes of individual psychological counseling per week. *Id.* at 26 ¶ 104. In addition, Dr. Jones noted that ADHD would be included as a primary disability on A.B.'s IEP. *Id.* at 25 ¶ 102. MCPS team members further detailed other aspects of the IEP, which was to include thirty minutes of occupational therapy per month, forty-five minutes of speech language therapy twice weekly, a GTLD resource class, several honors classes, and supported general education programming. *Id.* ¶¶ 104–107. A.B.'s parents expressed concern with A.B. being in large classes of twenty-eight students or more, given that A.B.'s classes at Lab were no more than ten students. *Id.* ¶ 108. The parents and Ressler also asked several other questions of the MCPS team, including whether A.B. would be with the same cohort of peers, whether he would receive support in honors classes, and

9

how A.B.'s speech language services would be delivered. *Id.* at 26–27 ¶¶ 108–110. At this point in the meeting, Ressler expressed that she and the parents believed A.B. should be placed at Lab, while the MCPS team recommended placement at Northwood. *Id.* at 27 ¶¶ 113–114.

As the discussion continued, the parents asked about how the proposed IEP would address A.B.'s trauma history. *Decision,* at 27 ¶ 115. Jones responded that the individual psychological counseling would be aimed at improving A.B.'s "coping skills and strategies and helping him to identify triggers." *Id.* The parents also inquired about their neighborhood high school, Rockville High School, but the MCPS team explained that Rockville did not have the infrastructure to provide reading intervention or special education for honors level classes. *Id.* at 28 ¶ 116. The Lab staff then provided input about how A.B. was thriving at Lab and Ressler reiterated that A.B. benefitted from Lab's adoption affinity group and trauma support. *Id.* at 28 ¶ 117–118. Joseph responded that Northwood was capable of supporting children with trauma. *Id.* ¶ 119.

A.B.'s mother and Ressler then expressed that they were disappointed by what they felt was the MCPS team members' decision to place A.B. at Northwood without hearing from the parents or Lab students. *Decision,* at 28 ¶ 121. They also noted that they felt A.B. had not received support when he was enrolled at a MCPS school. *Id.* Ressler requested a referral to the MCPS central IEP team for consideration of another placement, a request that Joseph explained the school-based team did not agree with. *Id.* at 29 ¶ 122. A referral was not made. *Id.*

Subsequent to the meeting on January 13, A.B.'s IEP was approved, with placement recommended at Northwood for the 2021-2022 school year. The IEP identified A.B.'s primary disability as a specific learning disability ("SLD") with dysgraphia, particularly in reading and written expression. *Decision,* at 29 ¶ 125. It also recognized that A.B.'s disability impacted him across multiple areas, including, but not limited to, math calculation, reading comprehension,

written language, attention span, executive functioning, and social behavior. *Id.* The IEP incorporated information regarding A.B.'s performance at Lab, the result of his educational and psychological evaluations, and input from his parents. *Id.* at 30 ¶ 127. It clarified A.B.'s social and emotional behavioral needs as well as his executive functioning needs and afforded a variety of interventions to address those needs, including use of assistive technology, academic monitoring, and frequent breaks. *Id.* at 31–32 ¶¶ 132–133. Altogether, the approved IEP afforded A.B. twenty-eight supplementary aids, services, program modifications, and supports designed to enable him to access the general education curriculum. *Id.* at 32–34 ¶ 134. It proposed that A.B. spend three hours and forty-five minutes of the school day in supported or co-taught general education classes and the remaining one-and-a-half hours in a reading intervention class as well as a GTLD resource class. *Id.* at 35 ¶¶ 139–140.

In February 2022, following the approval of A.B.'s IEP, his parents visited Northwood to observe the school and its classroom settings. Decision, at 36 ¶¶ 144–145. They reported that during a short observation of the GTLD resource class, they observed between fifteen and eighteen students working independently, with limited interaction between the students and the one instructor in the room. *Id.* ¶ 146. Ultimately, they felt placement at Northwood was inappropriate for A.B. ECF 1, at 12 ¶ 71. At some point after the visit itself, the parents also reported that they had met with Joseph during their visit to Northwood and that Joseph said "had the lawyers not been involved, she would have sent [A.B.'s] case to the central IEP team [("CIEP")] for it to consider the [] request for private placement [at Lab.]" Decision, at 86. Joseph and MCPS denied that the statement alleging that the case would have been referred to CIEP "but for the involvement of the lawyers" was ever made. *Id.* at 86–87.

11

A.B.'s parents filed a request for a due process hearing in April 2022, seeking placement of A.B. at Lab and reimbursement of tuition expenses paid to the school for the 2021-2022 school year. ECF 1, at 12 ¶ 72. The hearing took place from July 11 to July 15, 2022 and on July 26, 2022. Decision, at 3. During the hearing, the parents testified and presented Ressler as an expert witness. *Id.* at 4. MCPS, meanwhile, presented Jackson, Dr. Jones, and Joseph as experts, along with Jody Polon, an expert in occupational therapy. *Id.* The ALJ also considered several written exhibits, including minutes of the IEP meetings taken both by Ressler and by members of the MCPS team, psychological and educational reports for A.B., his social worker case history, and correspondence between the parties. *Id.* at 4 (citing to Decision Appendix, at 1–5).

At the hearing, the parents contended that MCPS had both procedurally and substantively denied A.B. a FAPE. *Id.* at 37. Procedurally, they argued that MCPS had impermissibly predetermined A.B.'s placement at Northwood, thereby depriving them of the right to meaningfully participate in the formulation of their child's IEP in violation of the IDEA. *Id.* Substantively, the parents challenged the recommended placement at Northwood on the grounds that the large class sizes, the proposed hours of special education versus general education, and the lack of an adoption affinity group denied a FAPE to A.B. *Id.* at 67. MCPS, meanwhile, denied that it had either predetermined A.B.'s placement or excluded the parents from the decision-making process. *Id.* at 39. MCPS further argued that the IEP it proposed for A.B. for the 2021-2022 school year was appropriate and provided him with a FAPE in the least restrictive environment. *Id.* at 68.

Upon conclusion of the hearing and review of the evidence, the ALJ determined that MCPS had not predetermined A.B.'s placement before developing an IEP for him, and rejected the claim that MCPS denied A.B.'s parents the opportunity for full and meaningful participation as required

by the IDEA. Decision, at 88 ¶ 1. The ALJ further determined that MCPS had made a FAPE available to A.B. and that A.B.'s IEP for the 2021-2022 school year was appropriate. *Id.* ¶ 2. Finally, the ALJ declined to resolve the issue of whether Joseph had told A.B.'s parents at their Northwood visit that she would have sent his case to the CIEP team if it weren't for the involvement of lawyers, finding the matter irrelevant to her conclusions of law. *Id.* at 87. A.B.'s parents appealed the ALJ's decision to this Court, contending that the administrative decision was irregularly made and substantively incorrect. ECF 1, at 13–14 ¶¶ 77–87.

## II.    **LEGAL STANDARD**

"[A] court's inquiry in suits brought under [20 U.S.C.] § 1415(e)(2) is twofold." *Rowley*, 458 U.S. at 206. "First," a reviewing court must ask, did "the State complied with the procedures set forth in the Act?" *Id.* Secondly, the court must inquire, is the IEP developed through the IDEA's procedures is "reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206-07. In the second step, the court is essentially tasked with determining if the IEP offers a FAPE. *Id.* at 207. This requires the IEP to be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399.

In considering IDEA claims, district courts conduct "a modified ne novo review" of the administrative record," affording "'due weight' to the underlying administrative proceedings." *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–1 (4th Cir. 2002) (quoting *Rowley*, 458 U.S. at 206). Accordingly, a district court should "treat the state hearing officer's factual findings and credibility determinations as '*prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding,' so long as the findings were 'regularly made.'" *G.M. ex rel. E.P. v. Barnes*, 114 F.4th 323, 334 (4th Cir. 2024) (quoting *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

If a district court declines to follow the recommendations of the hearing officer, "it is required to explain why" it has reached that decision. *A.H. v. Smith*, 367 F. Supp. 3d 387, 411 (D. Md. 2019). "[E]ven if the factual findings are found to be 'regularly made,' the district court still must make its own independent determination regarding the legal conclusions that have been drawn by the administrative officer." *S.S. v. Bd. of Educ. of Harford Cnty.*, 498 F. Supp. 3d 761, 775 (D. Md. 2020) (citing *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011)). "The Court then reaches its decision based on the preponderance of the evidence." *A.H.*, 367 F. Supp. 3d at 411 (citing *Rowley*, 458 U.S. at 205). At the same time, the Court may not "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Rowley*, 458 U.S. at 206. District courts are also to keep in mind that the party challenging the administrative finding – here, Plaintiffs – bears "the burden of proof of establishing a violation of the IDEA." *M.C.E. ex rel. T.Q.A. v. Bd. of Ed. of Frederick Cnty.*, Civ. No. RDB-09-3365, 2011 WL 2709196, at \*7 (D. Md. July 11, 2011) (citing *Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991), *cert. denied*, 502 U.S. 859 (1991)); *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

## III.   ANALYSIS

Plaintiffs advance two primary claims. Their first claim concerns the procedure by which the ALJ arrived at her decision, while the second argues that MCPS denied A.B. a FAPE on both procedural and substantive grounds. ECF 26-1, at 2. Ultimately, the Court concludes both that the ALJ's decision was regularly made, and thus entitled to deference, and that MCPS provided A.B. with a FAPE in compliance with the IDEA.

### A.   The ALJ's factual findings were regularly made

As noted *supra*, in evaluating whether an ALJ's findings are entitled to deference, courts look to whether those findings were "regularly made." Courts' understanding of whether a

14

decision has been "regularly made" is defined by the "*process* through which the findings were made, not the results of that process." *G.M.*, 114 F.4th at 334 (internal citations omitted) (emphasis in original). The decision-making process is "regular" if the hearing officer "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating [their] responsibility to decide the case." *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty.*, 516 F.3d 254, 259 (4th Cir. 2008).

At a surface level, the Court observes no glaring indications that the ALJ's findings in this case were not regularly made. To the contrary, the decision facially appears to comport with all necessary requirements: the ALJ conducted a proper hearing, which lasted six days and consisted of testimony and arguments offered by both parties, and afterwards issued a detailed, eighty-eight page decision explaining her findings. *Cf. J.P.*, 516 F.3d at 259 (finding that a hearing officer's decision-making process was ordinary and proper where the officer held a hearing, allowed the parents and the school to offer evidence, and resolved factual questions in a normal way). The ALJ's decision-making process therefore seems, at least at first glance, to be typical.

Notwithstanding this apparent regularity, Plaintiffs advance several arguments to support their contention that the ALJ's findings were not regularly made. First, they argue that because "[t]he ALJ failed to recognize the school system's clear predetermination," her findings could not have been regularly made. ECF 26-1, at 17. According to Plaintiffs, though the ALJ found that MCPS had not predetermined A.B.'s placement, such a conclusion was "simply not based on the record nor is it supported by the IDEA" and so could not have been regularly made. *Id.* at 33. However, this line of argument will not sustain a claim that an administrative decision was irregularly made. As the Fourth Circuit has previously explained, claims such as the one Plaintiffs

assert here are not true procedural complaints but instead merits arguments which are irrelevant to the question of whether an ALJ's findings were made according to the regular procedure. *See G.M.*, 114 F.4th at 335. In *G.M.*, the court observed:

> [the plaintiff's] overarching contention is that the ALJ's factual findings and credibility determinations are inconsistent with the evidence and thus, not regularly made. This argument is virtually always bound to fail because it imports a merits conclusion into what is supposed to be a procedural inquiry. . . . We cannot know what is inconsistent with the evidence until we consider the merits and figure out whose interpretation of the evidence is correct. And that substantive inquiry would defeat the point of focusing on procedure, namely, to accord proper deference to the 'original finder of fact' in this necessarily 'fact-intensive' class of cases."

*Id.* (quoting *T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 574–75 (4th Cir. 2018)). Here, Plaintiffs' argument mirrors that of the plaintiff in *G.M.* In essence, Plaintiffs are contesting the ALJ's factual conclusions. As the inquiry into whether the ALJ's findings were "regularly made" turns on the process, not the substance, of the decision, Plaintiffs' contention that the ALJ did not have the same reading of the facts as they do cannot be grounds for refusing to afford those findings due weight.

Plaintiffs' additional arguments regarding the ALJ's allegedly improper assessment of witness testimony likewise do not support their central contention that her findings were not regularly made. While Plaintiffs assert that the ALJ impermissibly "relied upon the testimony of MCPS witnesses" while giving "little deference" to the parents or their expert, ECF 26-1, at 37–38, administrative hearing officers have wide latitude in making credibility determinations. As the Fourth Circuit explained in *G.M.*, hearing officers are "not required to provide an explanation for 'accepting the testimony of one witness over that of another." *G.M.*, 114 F.4th at 335 (quoting *Cnty. Sch. Bd. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 306–07 (4th Cir. 2005)). While many plaintiffs in IDEA cases may genuinely believe that their own experts are better qualified and more credible,

hearing officers are permitted to assess evidence and testimony according to their own metrics, so long as their assessments are not arbitrary. *Id.* at 336.

Here, the ALJ properly weighed the testimonial evidence and permissibly chose to credit the school's witnesses and provided an explanation for why she did so, going beyond the procedural requirements of the IDEA. Though the ALJ acknowledged the parents' contention that the school's experts did not know A.B. and thus could not adequately address his needs, the ALJ explained that she nevertheless found MCPS teacher Sarah Jackson credible in part because she was "extremely knowledgeable about the needs of twice exceptional students" as well as very familiar with the GTLD programs offered by MCPS. Decision, at 78. Similarly, the ALJ explained that she found the testimony of Dr. Jones, the MCPS psychologist, credible because of his familiarity with the counseling services available at Northwood as well as his personal knowledge of A.B.'s needs, as gleaned through two separate evaluations. *Id.* 83. While the ALJ in the instant case expounded on why she found the school's witnesses credible, even a "bare-boned" decision that offers "no explanation of which evidence the hearing officer found to be most important or why the hearing officer was persuaded by the School Board's evidence" may be deemed regularly made. *G.M.*, 114 F.4th at 335 (quoting *J.P.*, 516 F.3d at 262). The fact that the ALJ here did offer the reasoning behind her credibility determinations only further confirms that her decisions were regularly made. *Id.* at 336.

Finally, Plaintiffs contend that the ALJ failed to make "a material finding of fact related to a crucial, dispositive issue in this case" and so her decision should not be entitled to deference. ECF 26-1, at 12. In Plaintiffs' understanding, the issue of what, if anything, Joseph said to the parents at their February 2022 visit to Northwood was a "crucial factual dispute" that the ALJ should have resolved but declined to do so, thereby running afoul of the procedural requirements.

*Id.* at 15. However, as a threshold matter, it is not clear from caselaw in this circuit that an ALJ must necessarily resolve *all* issues of fact in order for their decision to be deemed regularly made. In *J.P.*, for example, the Fourth Circuit explained, "while we have on occasion remanded IDEA cases to the hearing officer when the opinion failed to address a critical issue . . . our case law has never suggested that any particular level of detail is required in the hearing officer's decision." *J.P.*, 516 F.3d at 262 (citing *J.H. ex rel. J.D. v. Henrico Cnty. Sch. Bd.*, 326 F.3d 560, 568–69 (4th Cir. 2003)). The Fourth Circuit reaffirmed this principle in *G.M.*, holding that "[h]earing officers are required to address every data point in the record for their findings to be regularly made." *G.M.*, 114 F.4th at 335. Precedent seems to indicate that a hearing officer's decisions may be deemed regularly made even if they do not resolve every fact in dispute, particularly if that fact does not concern a "critical issue" in a case. *J.P.*, 516 F.3d at 262.

Moreover, in the case at hand, it is not apparent that the alleged conversation at Northwood is, ultimately, "a critical issue" that cuts to the heart of the case. Even the Plaintiffs' own submissions do not offer much in the way of explanation as to why and how Joseph's alleged comment is relevant to the question of whether A.B. was denied a FAPE. During the hearing before the ALJ, Plaintiffs' counsel did briefly suggest that Joseph's acknowledgment of the possibility of referral to the CIEP team was indicative of MCPS' unspoken belief that it could not actually provide a FAPE to A.B., despite its prior statements to the contrary. *See* Hearing Transcript, vol. 6, at 1209 3–8. However, Plaintiffs fail to show the relevance of the conversation to the substance of their claims in either their complaint or their motion for summary judgment

and do not appear to offer anywhere else in the record a viable theory as to how the alleged conversation bears on their substantive claims against MCPS.[4]

Even if the Court does assume *arguendo* that there is some nexus between the alleged conversation to the question of whether A.B. was denied a FAPE, there is no reason to think that the ALJ's assessment of the relevance of the dispute was irregular. After a hearing that the Court has already determined to have been properly conducted, and at the end of a decision the Court finds to be sufficiently considered, the ALJ declined to resolve the issue of the conversation on reasonable grounds. As the ALJ explained in the decision, she had already and independently found, on the basis of the other available evidence, that "MCPS made a FAPE available to the Student for the 2021-2022 school year." Decision, at 87. As such, the question of the alleged conversation bore "no relevance" to her analysis of whether the IEP "was reasonably calculated to enable [A.B.] to make progress appropriate in light of his circumstances." *Id.* On the whole, the ALJ followed the proper procedure throughout the hearing and decision-making process, a procedure which led her to arrive at the conclusion that resolution of the dispute over the conversation at Northwood was not crucial to determining whether A.B. was denied a FAPE.

Indeed, it is not even clear how she could have resolved the issue, at least not in a way that would have avoided unnecessary assessments of credibility on a collateral issue, as the only evidence available for her to weigh was the testimony of the parents against the recollection of Joseph. In contrast to the parents' recollection of the conversation at Northwood, Joseph testified that she had never said anything about wanting to make a referral to the CIEP but being unable to do so because of the involvement of counsel. *See* Transcript, vol. 5, at 1095 1–6. The hearing

---

[4] Notably, during the hearing, the parents' expert Ressler specifically noted that the parents' predetermination claim did not have any relation to MCPS's refusal to refer the case to the CIEP. *See* Hearing Transcript, vol. 1, at 113–14.

transcript reveals that there were already accusations that one party or the other was lying, *see id.* at 1101, and it is therefore understandable that the ALJ declined to make a decision on a thorny question of credibility which she reasonably concluded had no relevance to the crucial issue of the case. In sum, the Court concludes that the ALJ made factual and credibility determinations in a regular manner. As such, the administrative decision is entitled to due weight.

## B.    Denial of a FAPE

Though the Court has concluded that the ALJ's findings were regularly made and thus entitled to receive due weight, the Court still engages in independent review of the available evidence and makes its own *de novo* conclusions of law. *See M.M.*, 303 F.3d at 530–31. The Court first considers whether a procedural violation of the IDEA took place before analyzing whether a substantive violation occurred.

### 1.    MCPS did not procedurally violate the IDEA

The IDEA affords children and parents certain procedural rights, including the right for parents "'to participate in meetings' regarding the identification, evaluation, and placement of their child." *G.M.*, 114 F.4th at 330 (quoting 20 U.S.C. § 1415(b)). Procedural inadequacies may amount to denial of a FAPE only if the violation in question "(1) impeded the child's right to a [FAPE]; (2) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (3) caused a deprivation of educational benefits."[5] 20 U.S.C. § 1415(f)(3)(E)(ii).

---

[5] Plaintiffs make much of the fact that the Fourth Circuit has, in recent years, determined that the relevant inquiry is whether all three of the consequences contemplated by the IDEA occurred. *See R.F.*, 919 F.3d at 248. They argue that this is contrary to the construction of the statute, which, as evinced by the use of the word "or" instead of "and," seems to suggest that a finding of any of the three enumerated outcomes is sufficient to find a procedural denial of a FAPE. ECF 26-1, at 33. Since its decision in *R.F.*, the Fourth Circuit has seemingly clarified that any one of the three prongs under § 1415(f)(3)(E)(ii), standing alone, may support a finding that a child did not receive

For the purposes of assessing whether a procedural violation of the IDEA may serve as a basis for recovery, a "'mere technical contravention of the IDEA' that did not 'actually interfere with the provision of a FAPE'" will not suffice. *T.B*, 897 F.3d at 573 (quoting *DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester Cnty.*, 309 F.3d 184, 190 (4th Cir. 2002)). "Rather, the procedural violation must have caused substantive harm." *Id.*

Here, Plaintiffs claim that MCPS procedurally violated the IDEA by impermissibly predetermining A.B.'s placement at Northwood, thereby denying him a FAPE. Under the IDEA, a school board may not predetermine a student's placement before creating their IEP; put differently, the school board must propose a school placement that aligns with the child's IEP, not the reverse. *See Spielberg v. Henrico Cnty. Pub. Schs*, 853 F.2d 256, 259 (4th Cir. 1988).[6] "[I]f the school system has already fully made up its mind before the parents ever get involved, it has denied them the opportunity for any meaningful input." *Hanson ex rel. Hanson v. Smith*, 212 F. Supp. 2d 474, 486 (D. Md. 2002). However, courts have interpreted *Spielberg* to require the school board "to come to the table with an 'open mind,'" not "a 'blank mind.'" *Id.* (quoting *Doyle v. Arlington Cnty. Sch. Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992), *aff'd*, 39 F.3d 1176 (4th Cir. 1994)). As the Sixth Circuit has succinctly explained, "predetermination is not synonymous with preparation." *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006). "Thus, while a school system must not finalize its placement decision before an IEP meeting, it can, and should, have given some thought to that placement." *Doyle*, 806 F. Supp. at 1262.

---

a FAPE as a result of a procedural violation. *See G.M.*, 114 F.4th at 343 n.14 (considering only one prong of § 1415(f)(3)(E)(ii) in determining whether a procedural violation occurred).

[6] Note that the statute at issue in *Spielberg* was the Education of All Handicapped Children Act ("EHA"), the precursor to the IDEA.

Upon independently reviewing the evidence, and giving due weight to the findings of the ALJ, the Court concludes that MCPS did not predetermine A.B.'s placement at Northwood before formulating his IEP. To the contrary, the record reflects that MCPS engaged in sustained dialogue with the parents and repeatedly sought to address their feedback throughout the IEP team's multiple meetings. At the meeting on October 27, 2021, for example, the MCPS team opted to table further development of A.B.'s IEP when the parents expressed concern that it did not include sufficient emotional services, a fact that Ressler, an expert for the parents, testified to. *See* Transcript, vol. 1, at 166–169. Though Plaintiffs allege predetermination only in conjunction with the meeting that occurred on January 13, 2022, *see* ECF 26-1, at 10, the responsiveness of MCPS to the parents' concerns *throughout* the long process of formulating an IEP is indicative, writ large, of the school-based team's willingness to listen to and incorporate the input from the parents and their expert.

More substantively, the various written notes taken at the January meeting show that substantial dialogue occurred before the school-based team recommended A.B.'s placement at Northwood. The version of the minutes taken by Ressler indicates that MCPS first solicited input from the parents before confirming that the requests made at the October meeting had been incorporated into the IEP. Plaintiff's Exhibit 16, at 1. MCPS staff then offered their detailed recommendations for A.B.'s IEP, including co-taught honors classes, reading intervention programming, resource courses, and elective options. *Id.* at 2. When Ressler asked to explicitly connect the recommendations to A.B.'s needs, the school team members specifically detailed how the proposed services would address A.B.'s academic and emotional needs. *Id.* at 3–4. The school-based team's meeting notes reflect the same. *See* MCPS Exhibit 25, at 3–4. After this initial exchange, Plaintiffs contend, Joseph said she "could 'speak for the team,' by sharing what

had been decided prior to the meeting." ECF 26-1, at 10. But neither Ressler's nor MCPS' notes support this construal. Ressler's notes do indicate that Joseph said she could "speak for [the] staff" at Northwood, but specifically in response to Ressler's question regarding Northwood's ability to support children with trauma. Plaintiff's Exhibit 16, at 4. Contrary to Plaintiffs' characterization, Joseph was not announcing that the Northwood placement was predetermined.

Additional context from the meeting notes further belies the argument that the placement was predetermined. Along with their characterization of Joseph's phrase "speak for the team," Plaintiffs also point to an item in Ressler's notes where she indicates Joseph confirmed that the Northwood placement was predetermined. *See* ECF 26-1, at 9. However, when read in their entirety, Ressler's notes say that she expressed disappointment to "hear Ms. Joseph sharing a decided placement from the MCPS staff without hearing from parents or Lab School," to which Joseph responded only that "they did make the decision." Plaintiff's Exhibit 16, at 5. From the notes, it appears as though Ressler, not Joseph, was the one who characterized the Northwood recommendation as being predetermined. Joseph merely responded that the MCPS team had, in fact, decided to recommend Northwood, and did not characterize the decision as being predetermined and without the input of the parents. In her hearing testimony, Joseph further clarified that the MCPS did make a decision regarding Northwood but only at the January meeting and after a lengthy discussion between the parents and the school-based team. Transcript, vol. 5, at 1088 16–23. The Plaintiffs' reliance on their own expert's opinion of the situation is not a sufficient basis on which the Court may conclude that that the result was predetermined. As the ALJ correctly observed, a finding of predetermination is a "legal conclusion" that neither Ressler nor any of the other experts are qualified to make. Decision, at 49.

Indeed, while Plaintiffs' construe MCPS' Northwood recommendation as evidence of "overt predetermination," ECF 26-1, at 9, their assertion seems to misapprehend the legal definition of predetermination. As explained *supra*, impermissible determination under the IDEA does not mean that a school board must have a "blank mind." *Doyle*, 806 F. Supp. at 1262. Rather, some preparation and thought as to the appropriate placement is not only permissible, but also necessary. *Id.* Plaintiffs have not met their burden of proof to show that MCPS impermissibly predetermined rather than properly prepared. To the contrary, the record reflects repeated attempts on the part of MCPS to involve the parents, incorporate their feedback, and listen to their concerns. Even A.B.'s mother acknowledged during the hearing that MCPS never prevented the parents or Ressler from speaking at meetings, refused to accept the information they provided, or otherwise frustrated their ability to participate in the IEP process. Transcript, vol. 2, at 429–31.

The Court concludes that MCPS did not engage in predetermination, as the evidence shows that the IEP was developed over a series of conversations between the parents and the school team and that the school team listened to and considered parents' inputs at every stage. That the parents ultimately disagreed with the school's placement determination does not mean that their feedback was not noted nor that their participation in the process was foreclosed. As such, MCPS did not procedurally deny A.B. a FAPE.

As a final matter, the Court finds unpersuasive Plaintiffs' secondary argument that the school-based team members were required to respond when they and Ressler accused MCPS of predetermination. ECF 26-1, at 31. Plaintiffs cite the Supreme Court's decision in *Endrew F.* as support for their contention that MCPS staff had a duty to provide a "cogent and responsive explanation" to their allegations of predetermination. *Id.* (citing *Endrew F.*, 580 U.S. at 404). However, the cited portion of *Endrew F.* requires that school authorities offer explanations for

their decisions such that they can show how "the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id.* It does not require school officials to respond to all allegations of frustration or disagreement with an otherwise legitimate process. As the ALJ found here, the school team members reasonably felt, in light of the increasingly circular discussions as well as the results of previous litigation, that further discussion would not have been productive. Decision, at 64. Their reticence to engage with the accusation of predetermination is not indicative of bad faith or conspiracy, nor does it run afoul of the IDEA.

2.    MCPS did not substantively violate the IDEA

The IDEA encompasses substantive as well as procedural requirements. The Supreme Court has held that, to comport with the IDEA and provide a FAPE, an IEP must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207; *see also Endrew F.*, 580 U.S. at 399. As noted above, a review of an IEP questions whether it is reasonable, not ideal. *Endrew F.*, 580 U.S. at 399. The objective of an IEP is to "enable the child to make progress," as indicated by the child's ability to "achieve passing marks and advance from grade to grade." *Id.* at 399, 401 (internal citation omitted).

Moreover, "[t]he IDEA requires participating states to educate children with disabilities in the [least restrictive environment]–that is, alongside children who are not disabled, '[t]o the maximum extent appropriate.'" *R.F.*, 919 F.3d at 246 (quoting 20 U.S.C. § 1412(a)(5)). The IDEA permits states to remove a student with disabilities from the general educational environment "only when the nature or severity of the disability of a child is such that education in regular classes [with appropriate supports] cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); *see also R.F.*, 919 F.3d at 246 (quoting same). Finally, in order to satisfy the IDEA, a child's "educational program must be appropriately ambitious" and provide the child with "the chance to meet challenging objectives." *Endrew F.*, 580 U.S. at 402. If a school fails to provide

25

an adequate IEP and thus denies a student a FAPE, "the child's parents may remove the child to a private school and then seek tuition reimbursement from the state." *A.B. ex rel. D.B. v. Lawson,* 354 F.3d 315, 320 (4th Cir. 2004) (citing *Sch. Comm. of Burlington v. Dep't of Ed.,* 471 U.S. 359, 369–70 (1985)).

In evaluating whether a student has been denied a FAPE, a district court reviewing the findings of an ALJ may not "repudiate[] the findings of the ALJ and discard[] the expertise of the IEP Team without reason or explanation." *A.B.,* 354 F.3d at 327. It is impermissible for the court to "simply adopt[] the worldview of [a student's] experts and their perspectives on proper educational policy." *Id.* Even where the experts of a school board and those of a student might disagree, the "IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parent." *Id.* at 328. In IDEA cases, courts "afford great deference to the judgment of education professionals." *E.L. ex re. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.,* 773 F.3d 509, 517 (4th Cir. 2014).

Though Plaintiff's motion for summary judgment focuses on the issue of predetermination and notes only that MCPS "continued to ignore the extent of A.B.'s needs and offer[ed] an inappropriate placement," ECF 26-1, their Complaint argues that MCPS failed to offer A.B. a FAPE on the grounds that the proposed class sizes were too large, placement in general education classes was inappropriate, and the school's social and emotional supports were insufficient. *See* ECF 1, at 13 ¶¶ 80–82. The ALJ's decision reflects that Plaintiffs advanced the same three contentions at the hearing. *See* Decision, at 75–85. Accordingly, the Court considers each in turn.

*i.    Class Size*

Before the ALJ, the Plaintiffs argued that A.B. requires smaller class sizes in order to account for his executive functioning, attention, and social needs. Decision, at 75. They expressed a preference for the smaller class sizes offered at Lab and reported that A.B. was doing well in

those classes. *Id.* at 76. However, the ALJ found that Plaintiffs did not offer evidence that supported a finding that A.B. *required* small class sizes, merely that the parents preferred such an arrangement. *Id.* A review of the record leads this Court to the same conclusion. In the 2018 psychoeducational evaluation, for example, the evaluator noted that A.B. would benefit from classroom modifications such as sitting at the front, additional breaks as needed, extended time for assignments, and use of a computer for written output, but did not mention smaller class sizes. Plaintiff's Exhibit 3, at 22. Moreover, at the January 2022 IEP meeting, staff from Lab noted only that A.B. was comfortable in smaller classes, not that he required them. Plaintiff's Exhibit 16, at 4. Finally, while Ressler noted in the hearing that she was concerned about the impact of larger class sizes on A.B.'s processing speed and anxiety, her testimony was largely speculative and did not present evidence that A.B. would suffer negative effects from being placed in larger classroom groups. Transcript, vol. 1, at 95–96. Plaintiffs therefore did not meet their burden of proof at the administrative level to show that MCPS denied A.B. a FAPE on the grounds that his IEP did not propose small class sizes. *See Schaffer*, 546 U.S. at 62.

Instead, the IEP affirmatively addressed the parents' concerns about A.B.'s processing speed and other academic needs that they identified as being relevant to their preference for small class sizes. For example, the IEP afforded A.B. use of a word processor or computer in all courses, frequent check-ins regarding reading comprehension, provision of exemplars for written assignments, extended time for test-taking, and repetition of directions. MCPS Exhibit 26, at 36–39. These aligned not only with Joseph's evaluation of A.B. but also with the recommendations of the independent evaluation the parents obtained for A.B. in 2018. *See* Plaintiff's Exhibit 3, at 22. What's more, the IEP also afforded A.B. with a series of emotional supports to help address inattentiveness and anxiety, including development of strategies to maintain attention, allowance

27

for preferential seating, and provision of social skills training. MCPS Exhibit 26, at 42–43. The IEP offered multiple adjustments and services that addressed the parents' concerns. It was reasonably calculated to provide A.B. with the necessary support to receive an appropriate education in light of his difficulties with processing information, sustaining attention, and managing anxiety.

*ii.    Full Special Education*

Plaintiffs further argue that the IEP was insufficient to provide A.B. with a FAPE because it largely envisioned placement in general education classes. At the administrative level, Plaintiffs expressed that they felt A.B. required full-time special educational services and that MCPS' proposal to provide A.B. with special education services in co-taught general education classes was inappropriate. Decision, at 80. But, as with their arguments regarding the need for small class sizes, Plaintiffs did not provide evidence that A.B. required full-time special education. During the hearing, Ressler suggested that Lab's provision of "integrated" special education services was beneficial, but Ressler did not explain why. Transcript, vol. 1, at 179–180. A review of the record does not reveal any extrinsic evidence that would support this conclusion. Indeed, the 2018 psychoeducational report envisioned supported teaching in the general education environment. Plaintiff's Exhibit 3, at 22.

In the absence of clear indication that A.B. required full-time special educational placement, the IEP was both reasonably calculated to meet A.B.'s needs as well as compliant with the requirements of the IDEA. The IEP proposed that A.B. enroll in general education classes for Honors Algebra, Honors Chemistry, Honors World History, English, and an elective of his choice. MCPS Exhibit 26, at 62. It further clarified that each of these classes would be co-taught or supported by a school staff member trained to work with GTLD students. *Id.* Jackson testified that MCPS recommended these placements after careful consideration of A.B.'s abilities and his

28

need for appropriately challenging coursework. In particular, she noted that, for GTLD students in general and A.B. specifically, it was important to establish "rigor and structure" first and then add in "the supports necessary to be successful in that environment." Transcript, vol. 3, at 641 13–17. Such an approach accords with the IDEA, which affirmatively requires students be educated in the least restrictive environment; "[t]o the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A). In *Endrew F.*, the Supreme Court explained that the IDEA additionally required that a child's "educational program must be appropriately ambitious" and provide the child with "the chance to meet challenging objectives." *Endrew F.*, 580 U.S. at 402. The approach that MCPS took towards a GTLD student like A.B. accords with such requirements. The IEP was designed to offer him a rigorous courseload while still ensuring support for his learning difficulties, and thus the Court finds MCPS offered A.B. an educational program "reasonably calculated to enable" him to make appropriate progress. *Id.* at 403.

### iii.  *Trauma*

Finally, Plaintiffs argue that MCPS denied A.B. a FAPE by failing to adequately provide emotional supports that address his trauma history. Undoubtedly, A.B. has experienced a number of traumatic events during his young life, and it is reasonable to conclude that he requires support to navigate the aftermath of that trauma. Plaintiffs argued before the ALJ that MCPS' proposed services, including weekly counseling and the use of a "flash pass"[7] to take some space when required, were inadequate to enable A.B. to make progress despite his trauma. Decision, at 82. Instead, Plaintiffs emphasized the particular utility of the adoption affinity group offered by Lab

---

[7] Ms. Joseph and Dr. Jones described a "flash pass" as permission for A.B. "to leave the classroom at any time to go to a designated space and speak with a trusted adult." Decision, at 27-28 ¶ 115.

and argued that participation in the group better addressed A.B.'s trauma than would the approach proposed by MCPS, which included weekly counseling. *See* ECF 26-1, at 9.

The ALJ did not agree with the parents' arguments, and neither does this Court. As with their prior claims, the parents did not provide evidentiary support for either their argument that the affinity group was more beneficial than counseling or for the proposition that A.B. required access to the group in order to make reasonable educational progress. While A.B.'s mother did note at the hearing that the affinity group fostered discussions about identity and "racial and family makeup," Transcript, vol. 2 at 441 3–6, and A.B.'s father indicated that the affinity group assured A.B. that "there are students [at Lab] with similar backgrounds," Transcript, vol. 3, at 513 5–7, all noteworthy outcomes that certainly would enhance A.B.'s school experience, Plaintiffs did not provide evidence that participation in the group was *necessary* for A.B. to receive an appropriate education in light of his circumstances. By contrast, Northwood school psychologist Jones testified that he recommended A.B. receive weekly counseling on the grounds that the effects of trauma can be "longstanding," especially if not "addressed through counseling," and that A.B.'s need for counseling would be compounded by being in a new academic setting. Transcript, vol. 4, at 491 9–14. The Court concurs with the ALJ in finding this approach reasonably calculated to afford A.B. a FAPE. There is no reason to think that that provision of weekly counseling services specifically aimed at addressing trauma is not reasonably calculated to meet A.B.'s needs.

## IV.   CONCLUSION

The IDEA is a complex area of the law which concerns an important and often emotional topic, namely, the education of children with disabilities. The Court understands both the parents' desire to provide A.B. with the education they think best as well as MCPS' attempts to effectuate an appropriate academic program for a student like A.B. Ultimately, however, the "IDEA requires great deference to the views of the school system rather than those of even the most well-meaning

parent." *A.B.*, 354 F.3d at 328. The relevant inquiry is not whether the parents, or even the courts, find the proposed educational plan ideal but whether it is objectively reasonable. *Endrew F.*, 580 U.S. at 399. Here, the Court concurs with the ALJ in finding that MCPS provided A.B. with a free appropriate public education in accordance with the IDEA. Pursuant to 20 U.S.C. § 1412(10)(C), the IDEA does not require a public school system "to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." As the Court has found that MCPS offered A.B. a FAPE, Plaintiffs are not eligible to seek reimbursement of tuition expenses paid to Lab.

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED.

A separate implementing Order will issue.

Dated: <u>January 14, 2025</u>

                                             /s/
                                 Brendan A. Hurson
                                 United States District Judge